**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
<u>JACKSONVILLE DIVISION</u>**


**YOLANDA TUCKER,**

                               **Plaintiff,**      Case No. : 3:15-CV-869-HLA-JRK

v.

**YUSEN LOGISTICS (AMERICAS) INC.**

                               **Defendant.**


**<u>DECLARATION OF JEREMIAH STOKES</u>**

I, Jeremiah Stokes, declare the following to be true under the penalties of perjury:

1. I am the Branch Manager of the Jacksonville Office of the Transportation Division of Defendant, Yusen Logistics (Americas) Inc. ("Yusen"). As such, I am fully familiar with the facts and circumstances set forth herein.

2. I submit this Declaration in support of Yusen's Motion for Summary Judgment in the above-captioned case. Plaintiff, Yolanda Tucker, alleges that I and two other managers in the Transportation Division (i) discriminated against her on account of her race and gender, (ii) created a hostile work environment, and (iii) retaliated against her after she filed first an internal complaint and then an EEOC Charge. This is simply untrue.

3. I started my employment at Yusen on December 1, 2014. I believe that I was introduced to Ms. Tucker on the day that I started or shortly thereafter. I did not regularly interact with Ms. Tucker.

4. On the morning of January 12, 2015, I had an email exchange with Ms. Tucker about a contract with Lennox International ("Lennox"), one of Yusen's largest customers. As

part of my duties and responsibilities I manage Yusen's relationship with Lennox.  At the time, Yusen had an existing warehouse brokerage agreement with Lennox, a flatbed agreement and I was negotiating a new Master Service Agreement ("MSA") with Lennox to replace the existing transportation MSA.  Later that same morning, as I was passing by Ms. Tucker's desk, I stopped to ask her a question about Yusen's existing contracts with Lennox.  I asked Ms. Tucker about the interplay between the MSA and the warehouse brokerage agreement.  Specifically, I asked about their termination provisions so that I would know whether I needed to negotiate for the agreements to be co-terminus.

5. In a complaint that Ms. Tucker filed with Yusen's Integrity Hotline on January 12, 2015, the same day as the alleged incident, Ms. Tucker claimed that I stated "I know that I am speaking on a high level so let me know if you don't understand me."  (Exhibit H).  Ms. Tucker claims that the use of the term "high level" was offensive and demeaning.

6. I do not recall the exact words I said to Ms. Tucker but I did not intend to be offensive or demeaning.  I regularly use the term "high level" to mean a broad brush overview or 30,000 foot view of a subject as opposed to comprehensive, detailed specifics.  I used it in that manner with Ms. Tucker to mean I did not need the specifics of the termination provisions at issue just what type of provisions they were so that I could determine if I needed to deal with it in my then current negotiations.  I asked Ms. Tucker whether she understood what I was asking because I was unsure if I was making sense. I was in no way commenting on, inferring or implying anything about Ms. Tucker's intellect.

7. Ms. Tucker answered my question.  I thanked her and returned to my office.

8. Ms. Tucker did not tell me during our conversation that she was offended or ask me what I meant by the term "high level."  Instead, she sent me an email immediately after the

conversation when I had returned to my office. Ms. Tucker copied Earl Nash, Director, Finance and Administration, and Kyosuke Noguchi, Vice President of Operations for the Transportation Division.  Exhibit I.

9. I was very upset by Ms. Tucker's email and first spoke to Tiwanna Jones, the Human Resources Generalist for the Transportation Division.  Ms. Jones advised me that I should let Ms. Tucker calm down before approaching her to clear up the misunderstanding.  I then went to speak to Mr. Nash in Mr. Nash's office.  I told Mr. Nash that I was shocked by the email, that it was a misunderstanding and what I meant by the term "high level."  Mr. Nash told me that he would speak to Ms. Tucker and deal with it.

10. Later that evening, Ms. Tucker filed her complaint with Yusen's Integrity Hotline. Nowhere in the complaint does Ms. Tucker claim that I discriminated against her in any manner. Rather, she claims that Kelly Schuster, who at the time served as the Transportation Division's Director of Human Resources, and Ms. Jones turned me against Ms. Tucker.  Exhibit H.

11. At no time prior to receiving Ms. Tucker's email on January 12, 2015, did I ever discuss Ms. Tucker with Ms. Schuster or Ms. Jones.  It appears that Ms. Tucker believes that Ms. Schuster and Ms. Jones set out to turn employees against her.  I am unaware of any such activities by either Ms. Schuster or Ms. Jones.

12. On January 20, 2015, I sent Ms. Tucker an email in which I explained what I meant by the term "high level," apologized and attempted to clear up the misunderstanding. (Exhibit J).

13. I am informed by counsel that Ms. Tucker also claims that I discriminated against her by trying to go around her in her job.  Again, I did not intend anything by this.  I was

3

relatively new to Yusen and thought the best way for me to get legal advice regarding the contracts at issue was to contact Yusen's in-house attorneys directly. They advised me that I needed to copy Ms. Tucker on any emails and to include her in telephone conferences with them. To the best of my knowledge I did so after being told the procedure and policy.

14. I understand that Ms. Tucker claims that a meeting between Mr. Paolillo, Mr. Nash and me in which the Lennox contracts were spread out on the table constitutes evidence that we were discriminating against Ms. Tucker by cutting her out of the contract negotiation process. However, in the meeting at issue we were discussing Yusen's relationship with Lennox and whether there might be other ways in which Yusen could expand its business with Lennox. There was no reason for Ms. Tucker to participate in the meeting or to be advised of what was discussed.

15. My relationship with Ms. Tucker remained cordial until she resigned. We continued to interact whenever necessary and I did not treat Ms. Tucker any differently. Simply put, Ms. Tucker misunderstood something I said and later ascribed discriminatory intent to the comment.

16. As set forth above, I did not discriminate against Ms. Tucker in any manner. I did not harass her or create an unlawful hostile work environment. Similarly, I did not retaliate against Ms. Tucker for filing a complaint.

Dated:   Jacksonville, Florida
        July 28, 2016

                                                Jeremiah Stokes